Number 2430674 Complaint of Offshore Oil Svc v. Island Operating  Number 2430674 Complaint of Offshore Oil Svc v. Island Operating May it please the Court, Gavin Geo, on behalf of the Appellant, Offshore Oil Services, I have requested five minutes for rebuttal. This appeal concerns the District Court's finding on summary judgment that a contract was governed by Louisiana law, not maritime law, after applying this Court's 2018 test for maritime contracts. Briefly, to frame the issues, an overview of the facts is warranted. The appellee here, Island Operating, contracted in 2014 with Fieldwood, which is an offshore platform operator for various services. This contract is referred to generally as a Master Services Contract, or MSA. Under this MSA, specific jobs are performed under work orders. These work orders are either written or verbal. Here a simple work order in the form of an email called for one worker from Island Operating to go work on a Fieldwood platform. Now this worker helped operate the platform, to be sure, but he also worked to load and unload vessels and transport potable water from a vessel. The worker was injured while working on the job during an offshore personnel basket transfer when disembarking from an offshore oil services vessel, and sued Offshore Oil Services, the appellant for personal injuries. The contract between Island Operating and Fieldwood contains typical knock-for-knock defense and indemnity that you see in maritime contracts, where Fieldwood and Fieldwood subcontractors, like Offshore Oil Services, would be provided indemnity for the Island Operating worker's injuries. Offshore Oil Services brought this suit against Island Operating, claiming defense and indemnity under that contract for the worker's claims. This is a matter of contractual interpretation, not tort, so the fact that the worker was injured on the vessel is not relevant. The inquiry falls squarely under this Court's 2018 en banc decision in In Re. Larry Duaron that determines whether a contract is maritime or governed by the law of the adjacent state. Now to the issues on appeal, there are two. The first is, what is the law governing the contract between Island Operating and Fieldwood? If it is maritime law, the indemnity is enforceable. If it is Louisiana law, it is not. The district court here ruled that the Louisiana law governed the contract, and this Court's review is de novo. The second issue pertains to specific activities conducted by this Island Operating worker on the platform and under the governing contract, which included the loading and unloading of vessels and the transportation of potable water from a vessel. Whether these activities are, quote, classically maritime activities, this is a question of law, and the Court's review is de novo. So to the first issue, in 2018, this Court, sitting en banc in In Re. Larry Duaron, created a simpler two-part test for maritime contracts and replaced the previous much more complicated six-part Davis and Sons factors test. Here there's no dispute that the first of the two factors is met, so we're only dealing with the second factor. The second factor asks a question. Does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract? The district court here found that the contract itself did not answer this question, so it looked to the parties' expectations and found that Island Operating did not expect that a vessel would play a substantial form in completing the work. How much factual development did you do on this? Substantial factual development. Hmm. I'd say the primary three facts, Your Honor, that speak to expected and substantial vessel use involve the contract itself, the actual work performed, and the job safety analyses that memorialize that work, and Fieldwood's expectation. As I will get to, the sole form of evidence that the district court relied upon on summary judgment for his ruling is a single sentence in an Island Operating declaration providing that Island Operating did not expect such substantial and expected vessel involvement. Well, what kind of work did this fellow do, actually, normally? Excellent question. I mean, I suppose they're maintaining the platform? Yes. There's no question that this person performed some non-vessel-related work, but to your question about what is the quality of the vessel-related work that this person said — excuse me, that this person performed, we'll answer that question for you directly. When this court departed from the Davis and Sons factors with the two-part Dwaron test, it invited the parties in litigation to look to precisely what you've just asked me. The scope of the contract may be unclear, the extent to which the parties expect vessels to be involved in that work may also be unclear, and in resolving these issues, courts may permit the parties to produce evidence of the work actually performed and the extent of the vessel involvement in that job. That's exactly what Offshore Oil Services did. This specific evidence, which shows that there was regular, substantial, and expected vessel activity, takes the form of the job safety analyses. We cited these in our brief. Record on Appeal 886 and 887 are examples of it, and that is in addition to the contract itself. But speaking first to the work that this worker performed, more than 30 percent of his time on this platform was spent engaged in the following activity as memorialized on document Record on Appeal 886 and 887. The job safety analysis says offload and backload boat provides the wind and sea conditions. This worker signed this job safety analysis on a near daily basis. It describes the activity which he initialed next to the described work as follows. Review manifest for cargo equipment materials on vessel. Determine equipment or materials to be backloaded to vessel. Survey vessel deck and cargo placement. Determine sequence or order of cargo to be loaded and or unloaded. This is the... You referenced those reports. I think the briefing says 10 out of 28 days he engaged in that type of activity. But it doesn't tell us, the record, how, what percentage of the day it took to actually accomplish those activities. If it took 20 minutes to unload the potable water from the vessel to the platform and the remaining 12-hour day was engaged in non-maritime work, that's not a substantial portion of the day, is it? I think, Judge, to your point, there's also the absence of evidence showing what part of the day was not spent doing that work. So the record is silent from your perspective on what percentage of the day on these 10 days. So on the other 18, there's zero maritime work. On these 10, you cite to these references to what you characterize as maritime work. I think it's accepted it's maritime work. But we don't know how much of the day he actually spent doing that. The record is silent? That's correct. And is your contention that this information is a separate analysis from the Doron analysis or it's only used to help us clarify whether the parties expected that the use of vessels would be a substantial portion of completing the contract? I don't view it as separate from the Doron analysis. A year later, in a panel upon which Judge Jones participated in the Berrios case, the Berrios court clarified that if the contract itself is not clear on this issue, and we submit that the contract is clear on this issue because the contract uses the words loading and unloading of vessels to anticipate activity that was going to be performed. The Berrios court permitted the parties to look to the actual work performed if the court viewed the contract as unclear. So as I was saying a moment ago, what are the forms of evidence that the district court should have considered here when looking beyond the contract itself, and that is the actual work performed, the 10 out of 28 days where the loading and backloading was performed, and what the Fieldwood representative testified. The Fieldwood representative testified that actual work from a vessel was expected under the contract. But before even getting to that evidence, which the Berrios court allows, I go back to the contract itself. The work order, to be sure, is silent on whether there would be loading or offloading of equipment. But the master services contract from 2014 states specifically that there will be anticipated loading and unloading. So the inquiry before this- Well, is there any offshore work that doesn't involve unloading and loading? Yes, if this individual, this lone island operating worker, were only doing pumping and gauging on the platform and had no vessel involvement, I would submit to you that there's no chance of- Well, put another way, was the Anna M a crew boat or was it a smaller vessel and this fellow was going around small detached platforms here and there? The Anna M was an offshore supply vessel that also functioned as a crew boat. But the Anna M's use is what this gentleman, this gentleman was riding on the Anna M when he was injured in a personnel battle. I understand that, yeah. But that Anna M use is immaterial. It is this individual's work under the island operating and Fieldwood contract while he's on the platform loading and unloading various vessels, which included separately the Anna M. So while he's on the platform, as evidenced by these job safety analyses and as evidenced by the contract itself, which anticipates this type of work, he is working to load and unload vessels, which is a traditional maritime activity, and in the Berrios case and in Dwaron, it was established that 30%, much like the Jones Act seaman status analysis, is a good threshold to use to determine whether such activity is substantial. Here in our calculation, as Judge Rodriguez just mentioned, the amount of time that he spent working gives rise to a genuine issue of material fact, at the very least, on whether that work was substantial. Why do we get into the actual use of vessels in terms of the expectations of the party? My understanding is IOC says no expectation. Fieldwood's corporate rep says it could have happened, but it would not have been typical, the use of vessels. How does that create a fact issue that it would have actually been a substantial part of completing the contract? Why is that not clear? The Fieldwood representative did not testify about substantial nature. He testified that what he thought was part of the contract, although not something that was regular, would be work from a vessel. As this court in 2024 in Ernest B. Paulfinger recognized, work from a vessel is immaterial. But to your comment about the island operating workers, excuse me, the island operating company's declaration. There's a one sentence line. It's record doc 648 paragraph 13, where island operating and a declaration says that it did not have an expectation of substantial vessel involvement. And as a- That's a controverting evidence for purposes of summary judgment. That is where we disagree with the lower court on whether it's uncontroverted and what the court is allowed to look at on a summary judgment standard to question the veracity of that evidence. Because it's essentially a credibility determination. The argument I would make to the fact finder at trial, judge, is who are you going to believe? This one sentence declaration or the record before your lying eyes? The contract itself says vessel loading and unloading. The actual work that was performed as evidenced by the job safety analysis was that this worker loaded and unloaded vessels. And there's a fair argument that he did that more than 30% of his time, which is the rule of thumb to establish substantial use. So to argue that it wasn't expected is belied by the contract and the actual work. And then for the substantial part, it is- Your best argument that he did that more than 30% of the time is just the number of days that he did some of that work. I beg your pardon? Your best argument that he did it more than 30% of the time is what you have about the number of days that he did some of that kind of work. Isn't that it? That's correct. So you don't, again, as has been pointed out, you don't know how much time on any given day he spent doing that work. I think the record's unclear on that, as I mentioned before. But the real problem with the district court's opinion here is that it credited, it made a credibility determination on summary judgment of one party's loan sentence and a declaration that there was not expected or substantial vessel use. When the contract itself calls for that specific type of activity to be performed, and where the actual work performed matches that specific type of activity in the contract. I think that best there's a question of fact regarding whether that rose to substantial in nature, but the district court didn't even get there. The district court said it's not substantial because it wasn't expected. And because it wasn't expected based upon the loan sentence from the island operating company's declaration, that's sufficient summary judgment evidence. Don't we have to be a little more precise about the contract? And I realize you're coming close to the end of your immediate time, but more precisely, they were hiring an A operator. That's correct, Judge. An A operator, so this is from testimony, but monthly safety checks, compliance testing, well testing, take shakeouts, check chemical rates, start up compressors, load compressors, bring wells online. That is part of the A operator's job. But what I would direct you to, Your Honor, is record on Appeal 794, which is a testimony from the Fieldwood corporate representative, who said as follows. Would Fieldwood maintain records pertaining to what specific tasks were being performed by island operating workers for each day? And the answer was, all their work is on JSAs. So the JSA helps explain what the scope of the duty is for an A operator out there. What's JSA? I'm sorry, job safety analysis. JSA, job safety analysis, these are the safety meeting records, which are the tangible evidence of the work actually performed on the platform. And let me, I know you're out of time, but you keep referencing the MSC's use of language. Are you referring to, what in my mind I look at as the transportation provision, where at the end it says including without limitation while such member is embarking or disembarking or while such equipment is being loaded or offloaded from any vessel. Is that the reference you're talking about? There are three references and that is one. One of them, that is the one that references the specific loading and offloading. Section 2A of the contract references the exact type of work that would be performed on the intercontinental shelf. And section 2E is the choice of law provision. And what, with my time being up, I would suggest to you, Your Honor, is Judge Vance in the quarter north case. She interpreted the same contractual language on a summary judgment ruling. And she found that there were too many issues of material fact and dispute. And she relied specifically on the language in section 2A to say that the party's expectations were clearly in this contract for there to be some type of work. But we need to figure out at trial whether that was substantial. Thank you. All right, thank you. Mr. Coffman. Good morning, Your Honors. May it please the court. My name is William Coffman and I represent the appellee, Island Operating Company, Incorporated. Before I get to some of my prepared comments, I'd like to address a couple of issues that were just raised in the appellant's argument. The court, Judge Jones, asked what work was being done. The primary objective of this contract, there's no doubt, was production of oil and gas. And when the Fieldwood representative was asked about that on page 32 of his deposition, which is in the record at 539. He says they make rounds, they check pressure levels, they do what's called monthly Bessie testing, compliance testing. He goes on to talk about those classically oil and gas activities, turning valves and doing those types of things. He was, in fact, a pumper or a gauger, and that was his primary work. Any other work, such as any loading or unloading, to the extent it was even contemplated, was surely incidental. These platforms, these were not habitable platforms, is that right? Or were they? No, Your Honor. The platform, there was a habitable platform. He was working on a series of probably about four platforms. The main one was the West 90B complex. It did have living quarters on it. Okay, so that's what the potable water was for. Exactly what it was for. So a lot of this loading and unloading that was incidental was, frankly, to take his own provisions onto the platform. Was he out there by himself? He was not. He had co-workers out there, and from time to time, there were other contractors out there. Okay. To be clear, the contract does not reference the use of vessels by island. As Judge Jones just said, we have to be a little bit more precise when we look at the contract. Section 2A doesn't specifically describe the work, but it does reference an appendix. And when we look at the appendix, it has all sorts of options for what type of work can be done. And that's in the record at 665 and 666. Now, I wrote the Barry Graham case, which involved Fieldwood, and that was essentially the same contract, right? It was, and essentially the exact same appendix. Appendix, that's what I, yeah. Yeah, and the appendix in the Barry Graham case had the same options. And, for example, cranes, operator, and rigger was one of the options. It was checked in Barry Graham. It's not even checked here. Transportation is not checked here. What is checked here is the last option, other. And what was filled in was lease operations. And what type of lease are we talking about? We're talking about a mineral lease. Inherently a land-based activity. The exact sort of activity that Congress contemplated when they passed the Outer Continental Shelf Lands Act in the 1950s, and as explained in Rodriguez, intentionally decided to apply state law to this special type of work. The contract at issue, an agreement between Fieldwood, an offshore operator, and Island to provide pumpers and gaugers to produce oil and gas, is decidedly not maritime. Its principle objective, producing oil and gas, is not a maritime activity. The application of state law in the Outer Continental Shelf, the issue here, dates back to the 1950s with the passage of the Outer Continental Shelf Lands Act. The Supreme Court's 1969 Roderick decision gives great context and explains that with the passage of the Outer Continental Shelf Lands Act, state law was needed because federal admiralty law did not provide for things like the protection of workers and their families. Well, as you know, the courts got very wrapped around the axle interpreting all that and as the number of contracts burgeoned and everything. It did, and that was the Davis case. Yeah. But Davis, admittedly, was imperfect and included unnecessary tort-based factors. Those unnecessary factors were abrogated in Dwyron in favor of a simpler, more straightforward test as described in Kirby. And Kirby looked to the primary or the principal objective. Dwyron removed the clutter, and some of that was tort-based clutter. It directs us away from the minute parsing of facts that you described in Hoda, Judge Jones. This court commented in Dwyron that Davis proved to be confusing and difficult to apply, and may have led to outright inconsistency between the court's opinions. This case- You agree that the master service contract here specifically contemplated loading and offloading. I disagree with that, in so far as the written text of it. So paragraph 2E, which does reference loading and unloading. We gotta read the entire- References, but it didn't contemplate it or take it into account. You agree reference loading and unloading, is that what you're saying? References loading and unloading, but when that full paragraph is read, it's in the context of transportation to be provided by either Fieldwood or other contractors such as OOSI, and describes that that work, in theory, to be performed by the third parties, is going to be maritime, even when it's loading and unloading. And so your position is that when you look at the contract itself, MSC and the work order, it's clear there's no expectation that vessels would play a substantial role in the completion of the contract. And so this comes down to the expectation of the parties. Under that prong, do we consider the actual use of the vessels, the unloading of the potable water, or is it your contention that's clear as well, we don't even have to get to the actual use of the vessel? I don't think you need to get to it, because the use of the vessel here was in the nature of transportation. I think it's important to kind of look a little bit- What about the, sorry, but the, IOC claims, no, there's actually unloading of water, unloading of equipment from the vessel to the platform, that's maritime in nature. It's not simply the transporting of the individuals to the platform. By the end, in the ten days out of the 28, there's some of this type. Do we look at that? How do we consider that? Well, the loading and unloading, I would suggest, is part of the final portion of transportation. Sort of like in Kirby, that last leg of the bill of lading happened to be on land. And the court said, yeah, it was necessary, but it was insubstantial. Similar here, it's insubstantial. And it, frankly, is part of transportation. And even paragraph 2E of the master service contract suggests that that type of activity is, in fact, transportation. But I think in the- Loading and offloading is typically viewed as non-maritime activity, is that what you're saying? No, sir, I'm not saying that. What I'm saying is that that portion of the contract, when it does describe loading and unloading, it describes it specifically as transportation. And what this court said in Duaron footnote 47, and again in Barrios, is that transportation is not part of the calculus. But I think in the context of transportation, and in the broader context of these cases, vessels are really used in two contexts. One is transportation, and the second is as a work platform. In instances of work platforms, the vessel, usually a lift boat or a barge, is hired out to work in connection with a special project. It could be drilling a well, a downhole issue, wire line casing. It may be replacing a major component of the platform. If it's in inland waters or near a dock, like Barrios, they use a barge and moor it. If it's offshore, they use a lift boat and it spuds down. The vessel typically stays adjacent to the work site and is intertwined with the work being done under the contract, usually many times throughout the day. Often the crane on the vessel is used throughout the work. The vessel is often then used for living quarters. Its deck is used for things like welding, fabrication, cleaning tanks. The focus of most of these cases, whether Duaron, Crescent, or Barrios, is the extent to which that platform was expected to be used in the work of the particular contractor. For example, in Crescent there were three vessels, but the court really focused in on one vessel, a barge with a crane, and talked about it. I think it mentions four or five times that it was a work platform, and in that context it was important. Contrast that with the situation here where the boat is merely serving as transportation. It's just at the platform on an intermittent basis for a few minutes. We look at the work logs produced in this case. These lifts tended to take about 15 to 30 minutes. These guys worked work days that were anywhere from 12 to 15 hours. And Judge Rodriguez, you pointed to this, and I think Judge Graves, you did too. There really isn't a basis to say how much of his day was spent loading and unloading. It's your contention that the record does contain information that would allow the district court to determine what percentage of those ten days was engaged in the offloading of the potable water and the equipment? No, sir. It's not in the record. It's definitively not. The amount of the requisite evidence to make that determination to get to the sort of Jones Act analysis simply isn't there. The court in the Jones Act context looked at the same issue in the Alexander case. There they said, the plaintiff said he had participated in P&A jobs that 37% of his P&A jobs had a vessel. But that was where the evidence stopped. The court said that's simply insufficient to raise an issue of material fact. You haven't given us the amount of time he spent working with the vessel and the amount of time of his day. We've got the same thing here. And certainly, sufficient evidence was presented in the motion for summary judgment to determine that any use of the vessel was, in fact, insubstantial. OOSI would like to boil the declaration down to simply one or two lines, but it's 13 paragraphs. Among those, the statement, the sole role of any vessel in connection with that work was transportation. It talks about vessels were not expected to be used as work platforms. It clarifies that Island did not provide a vessel. In addition, we can look at the Fieldwood representative's testimony, and he focuses in all of his answers on classic oil and gas production activities. Turning valves, checking pressures, doing those types of things. So your position, in the contract, the only specific reference to loading or offloading of equipment occurs in the transportation provision, I think it's 2E. And the 2A does not use those specific terms, because that's the one that references the appendix, and that particular box is not checked. The only thing that's checked is the other for the leased operations. Correct, Your Honor. And in their reply brief, the appellant raises the fact that there is a reference to a vessel in the insurance provision. But this exact issue was dealt with by the court, I believe, in footnote 23 in Duaron. It was a very similar MSA. And in that instance, it was argued, well, wait, the insurance provision contemplates the possibility of obtaining insurance for a vessel. And I think in the oral argument, Judge Jones, you pointed this out, and the court dealt with it in footnote 23, and it said, look, under this work order, the contractor was not providing the vessel, therefore, that provision is not material to the analysis. And the same is true here. And if the court has no further questions, I'll yield the rest of my time. Well, I'm just wondering, following Duaron, under what circumstances would a master's services agreement like this contemplate the use of a vessel? Or let's say I'm mixing the two issues. Master's service agreement like this, so that's the first issue. And the second issue, did the parties contemplate the use of the vessel? Under what circumstances would it contemplate? Well, I think we also have to remember that the master's service contract is only part of what we're looking at. We've got to look at the master's service contract coupled with the work order. And in my mind, the classic example is something like Barrios or Crescent. So maybe the work order for offshore, for instance, might, you know, which provided the vessel, that contemplates the use of a vessel. Yes. Absolutely, it would. I mean, I think a closer call would be, for example, if they needed to drill a new well and they brought in a drilling vessel, or if they brought in a lift boat with that specialized crane that was going to be intertwined with the work. I would suggest that on the broad spectrum of cases, even looking sort of back to Davis, you really don't see a lot of these production operator cases, frankly, because I think this case is way away from the maritime contract on that spectrum. And in this case, the work order references A operators, and if I remember correctly, and the only evidence of what those job duties entail comes from the deposition testimony, I believe, that describes some of the nature of the work that an A operator would engage in, and I don't, does it, but it doesn't reference what we would consider maritime activity. Is that correct? Absolutely correct. And when pressed about sort of a remote hypothetical, the deponent said, we typically don't do that. I think that's very indicative that this was, at best, incidental. Okay. Thank you, sir. Thank you, Your Honors. Judge Rodriguez, I'd like to add on to the question you just asked about what the record shows on the A operator duties, and also supplement that it's not just from what a representative testified, but the field board representative, as I mentioned earlier, he testified in Record on Appeal 791 that the duties of the A operator are set forward, or of the island operating workers are set forward on those job safety analyses, which talk about the vessel-related work. A few points here, Your Honors, about transportation. We acknowledge that transportation of workers from platform to platform is not a traditional maritime activity that would give rise to maritime contract analysis in our favor. Transportation of equipment from platform to platform has similarly been held by some courts to account for that. That's not what this is here. This is the loading and unloading of a worker on a platform, loading and unloading equipment from vessels. So offshore oil services vessel has nothing to do with this. The fact that he was injured on the vessel has nothing to do with this. The two criteria that we're really looking at in the second prong of the DWARA analysis is expectation and substantial. So what is the expectation? Our first argument is that the contract itself expects this type of work, because as you noted, Your Honor, it's referenced in there. There's a dis- Mr. Guillo, can you clarify your reference to Section 2A? And as I understood it, your argument was that it specifically referenced that the work under this MSC and future work orders would include loading and offloading. But as I understand it, that's the provision that references the appendix, and that particular appendix doesn't have that box checked. I think that's a red herring. No, there are two sections of the MSA. Section 2A is what Judge Vance in the Quarter North case relied upon to find that the use of a vessel was anticipated in the contract. And she looked at that exact same language. This fieldwork contract's been circulated a good bit. And I think as my time is coming to a close, I would say that the same language in this contract in 2A, Judge Vance interpreted as finding that there was the expectation of a vessel to be used in the contract, and there was a question on whether it was substantial. Well, they're citing cases by Judge Afric and another judge that came out the other way, right? Yes. My firm actually has those cases, Your Honor. The Aries Marine case, and that Judge Afric, and then on reconsideration by Judge Long. And in those cases, it's a similar sort of thing, where on a summary judgment standard, the court is being pressed to make a credibility determination on what to believe about substantial vessel use. So first, you look to the contract, and here the contract mentions the work that was actually performed. And if through some tortured view of language, that loading and unloading that's specifically referenced is somehow akin to transportation, then you look away from the contract to what are the party's expectations, and what is the evidence of those parties' expectations about substantial use, and about whether it was actually expected. Here it's a declaration from one witness in the face of the actual work performed, in the face of what Fieldwood said, and in the face of the contract itself. And so what I submit to you is that this is a question for the fact finder. As a maritime practitioner myself, I draft a lot of marine contracts. After Dwaron in 2018, we took note, and we started adding behind choice of law clauses that the parties wanted maritime law to govern. We started saying, and the parties recognized that a vessel will perform a substantial part of the work in this contract. That language isn't present here, because this contract predates Dwaron. But on summary judgment, when you look at one sentence in a declaration that says we didn't expect this, in the face of the actual record of evidence, that's an impermissible credibility determination. One other point I would just reference in my minute remaining, unless your honors have any questions for me. In Dwaron, what made the change in Dwaron, the en banc opinion, was that there was unexpected use of a vessel. There was an oral work order that called for a contractor to perform downhole work on a gas well, and they encountered an unexpected problem. And that unexpected problem required a vessel and a crane to go out there. And so the analysis ended up being pretty simple. At the time the job began, there was no expectation of any vessel use for this. It was simple oil and gas stuff. Here, before the work even begins, you have a contract that references the work. You have a field representative saying that the work involves what's memorialized on the job safety analyses. And then you have the job safety analyses actually memorializing the work performed. Thank you. Okay, thank you, sir. The court will take a ten minute recess.